We'll start with Bryan v. United States, and we'll hear first from Tim Eastman. Good morning, Commissioned Court, Counsel, Agents for the Government, my clients. May I reserve three minutes? You may. I want to tell a story about something that happened in early September of 2008. We'll start with August 31st. My three clients were on their way to a cruise. They started in Puerto Rico, which meant that they flew from here to Puerto Rico. They crossed through a customs inspection station or a Department of Homeland Security inspection station to the current location. When they went through, Mr. Francis, who was seated all the way to the right, had some shaming power. It went up on that part that moves when you go into customs, and he warned the agent, look, it's full. If you open this power, you're going to burn. Counsel, we're very familiar with the briefs and with the recitation of the facts and the record here before the district court. Given our limited time today, I think it would be helpful to focus on the issues around qualified immunity. And let's start with the question of the timing of the issues with it. Qualified immunity, of course, is to protect all but the plainly incompetent or those who knowingly violate the law. Would it really qualify as incompetence for an officer not to know about a case that was issued just one day prior, particularly in a different circuit than the one he was actually working in? Okay, well, that's a great place to start. Let's address that. Let's talk about what the state of the law was at the time that they got on the board. Not only the state of the law, it's what the Border and Customs Patrol people reasonably should have known. They don't have an instant blast that the Third Circuit Court of Appeals has issued an opinion saying so-and-so. They are, through their superiors or education there, provided with knowledge. Do you have any cases that support the idea that instantaneously all affected persons, all affected government employees, must be made cognizant of a change in the law? Well, Judge, let me answer the question this way. They didn't raise the ladder of notice. They didn't claim that they didn't have notice. And what I'm going to tell you is that since 1973 in this circuit, there has been a heightened sensitivity for non-routine border searches. It was clear that it was deciding an issue that was unresolved previously in our circuit. And there is obviously not a consensus around that issue, as the 11th Circuit, since that time, has come out the other way on the issue. So we're focusing simply on the issue of timing. And given that we're supposed to look to whether a right is clearly established and use the objective standard of a reasonable officer, would a reasonable officer be aware of this law or would it be considered a clearly established right when the case was decided one day prior? But Judge, the answer to that question is we do have to look at the record here. And what the record says is that they didn't come up with, we didn't know about this, we didn't know about the reasonable suspicion standard. That's their word to demonstrate that the timing was not sufficient to educate these officers in the right way. That's the nature of the qualified immunity defense that they seek to raise. That is, whether it was a clearly established right and whether the reasonable person standard, the objective standard, that was supposed to apply for qualified immunity in the district court must apply as well, is one that would take account of someone whose conduct was judged by a different standard because of the case issued the day prior. Yes, so Judge, what I'm saying is that they have to tell us, hey, we didn't know. This was not enough time for us to know. What are you saying they have to tell us? No, I'm saying during our litigation, the government, once we say this was the law, this was the clearly established law, they have to come in and say, wait a second, we didn't know about it. This wasn't enough time to assimilate this. They didn't say that. It's our position that they weighed that issue on this record. But I will tell you that for the last 45 years, both this circuit and the Supreme Court have been telling the government agents there is a heightened sense of security when you go into somebody's quarters on a ship. There is, when these are non-routine searches, the reasonable suspicion standard applies. That started with the Beck case in 1973 out of the circuit. It was followed by Montplier. As you know, there are different views in different circuits. So let's put aside for the moment the issue of the timing and whether it's clearly established or a reasonable officer should know about a case issued one day prior, which is its own hurdle. Let's go back to Judge Ross' question. How about if that officer is in a different circuit than the one where he's now been sued and you seek to apply that circuit's law? If this were the 11th Circuit, this would be a very different case, right? Well, I'm not so sure, Judge, and I'll tell you why. In my 28 years of prosecutor, most of that I hear, when the government has an adverse case, it gets the information out right away to the troops. Yes, but this was one day. This was one day. And with the muscle man, when they put that into effect, bingo. Instantly, all of our stations around the world immediately put that into effect. When this government wants to act, when this government wants to make its information known to its agents, it has a way to do that. But this is not an executive order. This is not a case even of the Supreme Court. This is a case decided by the 3rd Circuit, and an officer who is conducting his affairs within the 1st Circuit. So what would you have us use to define the reasonable officer standard that would take account of those circumstances? I think the day the law comes into effect, okay, then it's upon the government to say that's not enough time. We didn't have enough time to get it. But isn't the responsibility of the government to say to the 1st Circuit, well, the 3rd Circuit has said it doesn't so. You must do what they say in the 3rd Circuit, because it's not the law in the 1st Circuit, is it? Well, see, here's how it works in law enforcement, Judge. Agents of the United States have responsibilities in multiple circuits. So the training material that goes out to agents tells them here's the law in the 1st Circuit, here's the law in the 5th Circuit. If you have this issue, you know, be sensitive to this. So that's part of the training mission that the U.S. government has for its agents, okay? And if you think about this, it's not that these border patrol – I'm sorry, that these DHS employees work in a vacuum, and that the things that they do don't affect other districts and don't affect searches in other districts. If they're going to do that, then they have the responsibility of knowing the law. Is it your responsibility, then, in bringing the claim of the nature here, to demonstrate that the government did not reasonably let the BCP know of the 3rd Circuit decision? I think our responsibility, Judge, is to point out what the controlling law was at a particular time, okay? But it's more than – the employees of the BCP, on their own, do not do legal research. They don't sit by their computer every night to figure out what the courts in different circuits have done. They, I'm sure from what you said, they rely on notification that they get from the government. So do you have a responsibility, do you have a burden of proof to show that the government was derelict or deficient in letting its customs officials know about the 3rd Circuit decision when it happened? And what is a reasonable time for them to let them know? Okay. I think our – to answer your question, Judge, I think our responsibility is to demonstrate what the law was at the time and that then it's the government's burden to respond and say, that's not sufficient, okay? And how do we determine that one day is not sufficient in this day and age? The government has to come and say, look, this is an unreasonable burden to put on us. Here's why. We didn't have fair notice. These agents didn't have fair notice. They didn't know about the reasonable suspicion standard. But at the very same time, if you look at what Ahad's doing, is he's trying to create reasonable suspicion in this record. And the judge had trouble with his credibility. Let's turn to that subject for the remaining time. You cite Matherin for the proposition that a past criminal conviction was an arrest record. It's not sufficient, although, for reasonable suspicion. Yes. Matherin recognized that there was still relevance to a past conviction for purposes of reasonable suspicion. Where we have here not simply the text – one text record, but two lookouts, both relating to narcotics trafficking, those two people prowling together, and to a high-risk area. Why isn't that enough for the minimal level of objective justification that is the standard for reasonable suspicion? I'll answer that question. First of all, here's what we have. Two records. One was a 2004 reference to a 2000 entry in which the officer didn't even look at the 2000 entry. So we have a 2004 entry. If you look at that, there's almost nothing there. And in 2008, he can check, I can check to see if there were any arrests or convictions from that. There were none. So it couldn't corroborate whether that was information upon which to be relied on, number one. Secondly, we have a 2006 evaluation. That's all we have. This drug-sourced country issue, I would submit to you that this is not the way one demonstrates that put on any of his drug-sourced country. I did not even know which countries this cruise ship was going to when he was asked. Well, that was in his deposition, which was years later. Okay, so where – When he was making the list, is there any evidence that he didn't know where the ship was going? I don't think so. Yeah, I can't answer that, Judge. That would cause me to speculate. But here's what I will say. If you're going to say that there's a drug-sourced country, okay, then, you know, you've got to put some evidence in. We've arrested 86 people traveling from country X. They import cocaine or export cocaine from them to drug trade ships. Or Jamaica grows a lot of marijuana, and we have a bunch of arrests. We can say that's a drug-sourced country. We have nothing like that in this record. You have a reference to two very old pet records. Then there's supposition, the drug-sourced country that gets swallowed. Okay, that's good evidence if you have something to back it up. You don't just simply make this statement. If you were sitting in the capacity that you used to have, Judge, as a district court judge, and somebody's presenting a search warrant, and they just say drug-sourced country without anything else, what kind of – look at what I've answered my questions. What kind of drugs were involved? I don't know. What were the quantity of drugs involved? I don't know. How long was this organization in operation? I don't know. Counsel, unless my colleagues have further questions, at this point we'll hear from you. I'd just like to ask counsel, Mr. Nisman, one question about this clearly established issue. You alluded to the fact that, notwithstanding Whitted having been decided the day before, that the law in the circuit, even before Whitted, was clear. You alluded to that, correct? Yes. Tell me which case you're hanging your hat on to say it was clear. Okay. I'm going to start with the Beck case. The what? U.S. v. Beck from 1973. It's cited in our motion to dismiss. All right. And, by the way, that police case is from other districts. What that case says is, instead of the usual requirement for all of us to believe that the individual possesses And that's from another district. No, no. I'm reading from the 3rd Circuit case right now. It is the 3rd Circuit case. It's the Beck case. Okay. And it collects cases from the other districts. And it says that customs officers need only have a reasonable suspicion of illegal activity. Okay, so this is where it starts. But it also references cases from the 5th Circuit, the 4th Circuit, the 2nd Circuit, and then we have the 9th Circuit case that's cited in the briefs that's called Alfonso. On top of that, so then the 9th Circuit in the Alfonso case told the government in 1985 that there was a heightened sense of privacy in cabins on ships. In 1985, the Supreme Court in the Montoya case told the government that border searches were not exempt from the constitutional test of reasonableness. In 2004, in the Flores-Montana case, the Supreme Court said that highly intrusive searches that implicate dignity and privacy interests must be supported by a reasonable suspicion. And regardless of all this, on the knock-and-announce, there's a clear violation of the knock-and-announce. This is not banging barge in, okay? And so... Thank you, counsel. We'll hear from you again on the vote. Thank you. Ms. Jacobs? What's the government's position as to when a reasonable officer in the 1st Circuit would become aware of who it is? Your Honor, the CBP does make an effort, certainly, to get the word out about really important decisions. It wouldn't happen here in the timeframe that is involved. We have a decision on September 4th, 2008, and it's the next morning, around 8.30 in the morning, on September 5th, that Officer Ogg is entering, doing the final work to put together the search list for the Adventure of the Seas cruise on which the plaintiffs were traveling. Now, as to your question about when exactly or when Officer Ogg might have learned about this, it is important, I think, to go back to the issue that Judge Roth raised at the start of this argument this morning, and that's the fact that Officer Ogg was in the 1st Circuit. The 1st Circuit has held that a single opinion from another circuit is not, as a matter of law, sufficient to clearly establish a right. That was an agenda to be joined back in 2007. And so here, I think even if we assume, for the sake of this discussion, that Ogg should have known about Whitted, or even had known about Whitted, which there is nothing to suggest, of course, in this record that he had any knowledge of Whitted. Wasn't there a body of law out there that was robust that talked about the necessity to have reasonable suspicion to search a cabin? No, Your Honor, absolutely not. But isn't there a heightened right to privacy? Hadn't there been even before Whitted, and cases that Whitted relied on, a heightened right to privacy in living quarters like a cabin on a cruise ship? No, Your Honor. So Whitted is very clear that it is breaking new ground in its holding of a border inspection taking place on a cruise ship. So to the extent there had been prior cases looking at any kind of heightened privacy on a ship, those were not border searches. And so Whitted makes it very clear, and it's forthright about the fact that it is breaking new ground in this regard, and as Judge Krause noted, it's the only court of appeals to date that has gone in this direction. The 11th Circuit has since reached the opposite conclusion. But it is important here to keep in mind the context. For border searches prior to Whitted, suspicionless searches were the norm for cabins, for vessels. We have a foreign flag vessel coming into a port. It's undisputed that this is the functional equivalent of the border, that CBP has its border inspection authority at its height. And so the question, you know, there's no question still to this day that various other types of searches of vessels take place on suspicionless grounds. Whitted, of course, held that reasonable suspicion was needed for the cabin search. But to go back to Judge Krause's question from earlier, because I think these two tie together in an important way, even if we assumed that Alec should have known or knew about Whitted, all he would have had to go on would have been Whitted because Whitted was breaking new ground. And even if he had read Whitted, there would be nothing in Whitted that would have suggested to him or that would have told every reasonable officer that recommending the plaintiffs for a cabin search was unlawful. So qualified immunity would still be applicable. But what about labor? The appellants say, sure, you've waived this issue. No, Your Honor, in the district court, we argued very clearly that they were entitled to qualified immunity. And we raised the fact that Whitted was decided one day prior, and we raised the fact that Odd was in the First Circuit and that this decision was coming down in the Third Circuit. And we made clear the argument that it was simply not the case that, again, this is a suit for money damages, that it was not the case that any reasonable officer could not possibly have believed that his conduct was lawful in light of the clearly established law and the information he possessed. Help us with the standard because the reasonable officer standard, as we know, is an objective one. So objectively, what is the right amount of time? What is the government's position as to when a reasonable officer would become aware of a case of an opinion that was held? Your Honor, I think the best that I can offer is to point to cases that make clear that one date isn't sufficient. It's obviously going to be – there is – I can point to other – to cases that suggest where that line might be drawn. I can't stand here on behalf of the United States and suggest that I know precisely where the line is. But the Supreme Court – So what do we do as a court of appeals? I mean, this is unusual because it is one day. Right. And, you know, maybe one day is your best argument here. But what do we do when we look at cases like this? How much time do we have to say needs to ensue before the law enforcement community knows of the existence of a rule that we might propound in a given case? Maybe it's in this case. Well, I think, Your Honor, maybe the court could point to Wilson v. Wayne, which is a Supreme Court decision that looked at a Sixth Circuit decision. And it described that decision as having been decided a mere five weeks before the events and issue took place. And in that case, the events and issue were in the Fourth Circuit. There was no clearly established – the Supreme Court ultimately found no clearly established law, but there was no Fourth Circuit control and authority. And to the extent they looked at the Sixth Circuit decision, noted that it was a mere five weeks before the events and issue. Perhaps all of this argument – perhaps off base in that it's not clearly established until the Supreme Court says it's clearly established, that it's the law? Well, certainly it remains an open question in the eyes of the Supreme Court as to whether or not a single decision of a court of appeals can clearly establish law even in that circuit. But even assuming that it does for the purposes of the Third Circuit – again, Officer Ott is in the First Circuit, and the First Circuit has held in Genesee Jones that a single opinion of another court is not, as a matter of law, sufficient. But taken to its logical conclusion, wouldn't that provide a sort of blanket immunity to officers even if the officer knows – and let's step back to that being a more objective standard – say a customs office where the work of that office is routinely looking to consequences in a different circuit. So a reasonable customs officer working in this section, even in the First Circuit, would be aware of search being conducted in the Third Circuit. To say that they don't need to address the clearly established law of another circuit simply because of where geographically they're working would seem to provide blanket immunity for officers who well know that they may be violating the Constitution. Your Honor, I think the question again here is what was clearly established on September 5, 2008. And I point to Genesee Jones just to make the point that it certainly wasn't clearly established at that time that the Third Circuit precedent was sufficient to clearly establish the law for him. So that goes back to a temporal argument. But you also asked us to factor in that it's in another circuit. And I'd like to understand how that factors in to clearly establish a reasonable officer standard. Yeah, Your Honor, I apologize. I didn't mean to make it sound like a temporal argument. What I'm bringing out is that I understand that this is a difficult question of when is it that a single decision of another circuit could clearly establish the law for an officer elsewhere. And I certainly take Your Honor's concern, but my point is simply that certainly as of September 5, 2008, it wasn't clearly established that he needed to abide by, for purposes, for these purposes, by the law of another circuit. He wouldn't have been aware that this is what he needed to do, and that's the crux of the qualified immunity inquiry. As a factual matter, because I think Your Honor's question spoke to this, I just want to also emphasize that Officer Ott testified that he intended the search to take place in Puerto Rico. That wasn't disputed. That was his subjective intent. Now, for personal jurisdiction purposes, the court came to the conclusion that it was sufficient that it would have been foreseeable that it might occur in St. Thomas. But for qualified immunity purposes, I think it remains relevant that this is what he anticipated. And, in fact, of the searches that he recommended, I think there were nine cabins on the list. This was the one cabin that was searched in St. Thomas. Counselor, what if it was clearly established? Did they have reasonable suspicion here? I think they did, Your Honor. It seems to me that the government's argument, if you look at the facts that the argument is based on, is that anyone who was in the tech system with a lookout for drugs, that any time that person was on a ship in the future, that that was sufficient to search a cabin, particularly if there were two people who had information that may have been somewhat stale but was in the tech system. Is that essentially the position of the government? Your Honor, I think towards the end of Your Honor's question, I think we got closer to what this case is about. You need to have two people together. It is the only case that I can speak to because of the nature of the reasonable suspicion inquiry and the extent to which it is so context-driven. And here what we have is a travel party that includes not one but two individuals, one who has a DEA indictment. What does that mean? Well, I mean, you know, back in the old days, you'd look at a rap sheet and the rap sheet would have a charge, and you wouldn't know whether the charge, whether the indictment was a conviction or not. You couldn't cite to the court that, well, I have a charge here such and such a year. The court would want to know, was there a conviction? I mean, what does an indictment mean? Does that mean anything for reasonable suspicion? For purposes of reasonable suspicion for a border inspection, I think it does. Because, again, this is all taking place in the context in which Officer Ogg has been working. He's the officer who on a week-to-week basis is looking at the 3,000-plus passenger manifest for this cruise ship. And he knows what he is seeing and what he's been trained in and what he normally comes across in his searches because he's responsible for looking at all of the passengers who are going on this cruise. And when he looks at this particular travel party, he sees not one but two individuals traveling together, one who has a 2006 DEA indictment record in the tax record, and another who also has previously been flagged because of suspicion of drug smuggling. What does an indictment, what does a DEA indictment mean? Well, it means that there was at least sufficient cause to indict. And so in terms of developing reasonable suspicion, again, nothing further than that, I think you're representing that reflects a grand jury indictment. That is a traditional indictment. That is correct, yes. There's no reason to think here that the DEA indictment, yes, I should explain the tax records. I apologize. I didn't realize the nature of the question. The tax records have a very limited amount of space for writing. So they don't include lengthy descriptions of things such as an indictment on drug charges. DEA indictment would be a typical shorthand for saying that here is a grand jury. But that was on an old text entry, right? That's correct. That's correct. So there's information. The officer wouldn't have known that that later resulted in a conviction. That information was not available to him. What he has available to him are the tax records. And what he also has available to him in theory, right, like, again, if we're going to assume that he should have known about Witted, the information, the directions that he would have gotten from Witted would have led him to conclude that the information before him was sufficient to develop to have reasonable suspicion. Because Witted looks at a couple things that are really relevant here. In Witted, this court accepted that knowing the itinerary of the ship, and the ship in Witted was going to the same drug transit, drug source countries. It was the same ship. It was the same cruise. So the first factor it looked at was those destinations, which are relevant here. So to the extent plaintiffs are challenging reliance on the itinerary, Witted counsels to the contrary. And Witted also talks at length about the reasonable suspicion standard and looking at tax records. And so just quickly, two points. One, Witted states reasonable suspicion is not a high standard that will prevent customs officers from detecting drug smuggling at our borders. Rather, it sets a relatively low threshold that will continue to permit the kind of cabin searches customs officers currently conduct. How does that provide reasonable suspicion to search Ms. Beberman's cabin? Well, Ms. Beberman's cabin was shared with Mr. Bryant. So to the extent Mr. Bryant's cabin was going to be searched, that constitutionally would provide the basis for searching Ms. Beberman's cabin. They were in the same cabin. The fact that they're traveling together is sufficient to put a text entry in with the content that was entered here. Doesn't that raise questions about the significance and reliability of those text entries at all in informing reasonable suspicion? Well, again, just a point. I'll take this in two parts. One, just a quick point about Witted, and then I think more directly to Your Honor's question. Witted itself says that we have to allow customs officers to rely on text records because we recognize that given the constraints of border inspections, their hands would be tied if we suggested that they needed to independently confirm or investigate text records. That's not a possibility. Witted acknowledges that and says expressly, as a result, that customs officers should be allowed to rely on existing text records. The second point I would make, Your Honor, is that here the nature of plaintiff's complaint, their suit, is a challenge, a Fourth Amendment challenge, as a result of the actual search that took place in St. Thomas. The specific language of the text entries, no one is suggesting that that is the constitutional violation, the particular words that were used. Again, the language of the text entries reflects the fact that they are entered under both time constraints, as the individual here, Officer Ogg, is going through the 3,000-plus passenger manifest, and they're meant to communicate specific things in terms of the results they seek. So here, Ms. Biberman's record is entered because, as the officers explain, when Officer Ogg enters the text record, he can't control whether or not the search actually takes place. You addressed that in your brief. Yes. Okay. So in terms of their ability to potentially leave the ship without inspection, that is one reason that the record is entered as it is. I apologize. Did Your Honor have a question, or did I? Thank you, Counsel. Thank you. I know I'm here to answer your questions, but I would like to spend at least one minute talking about knock and announce, because on that issue we clearly win. That is clearly established law since 1948. There's a statute on it, 18 U.S.C. 3109. There are many Supreme Court cases on it. But don't all of those cases involve the knock and announce rule for a search based on probable cause? That's a good question, Judge, because there is no limitation in any of those cases on any geographic area. There's nothing that would say that in a reasonable suspicion area like the border that you don't have knock and announce. And, indeed, they're not making that argument here, that the knock and announce rule doesn't apply here. That's not an argument. Borders are different. Borders are different. But, Judge, let's go to the big picture here. The Fourth Amendment is a reasonableness test, right? And all searches without warrants, even on the border, are presumed unreasonable. There is a border exception to the warrant requirement. So what we're really dealing with here are can they rely on these exceptions. And there is no exception for the knock and announce rule. And think about this. Why would there be a different rule on the border for knock and announce? Because you might flush something down the toilet. They don't claim that here. And, by the way, just remember how they go in there. They go in there with the key. They're working with the cruise ship company, okay? They're not putting on any evidence to say that the evidence would be disclosed on them. That cruise ship can control the functions of the cruise ship. Counsel, as of the day before Whitted, in the Third Circuit, it was not yet clear even that reasonable suspicion was required to enter a cabin of a ship that was at the border. I understand that, in addition to reasonable suspicion, you'd like to apply a knock and announce rule. But what is your authority for that? Okay. I'm going to answer that very directly, Judge Krause. The reasonable suspicion standard was well established, even in the border search context, for intrusive searches, which the judge found this search to be intrusive. I'm sorry. There's a follow-up question. I'll go with it. But I really feel like that's the best answer that I can give you on that issue, is that all those cases that I cited before, you know, going back to Montoya and Montana, make it very clear that the Supreme Court is saying to this government, Hey, with intrusive searches, you can't just go barging. There is a standard, and it's a reasonable suspicion standard for 20 years out of the Supreme Court for intrusive border searches. And the court found that this search was intrusive, and they have no justification for not following a knock and announce. But clearly that's not happening. That's not what happened in this case. All right, counsel. Okay. Thank you very much. Thank both counsel for their helpful arguments. We'll take the case to under advisement.